JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS
TJ GOMES TRUCKING CO, INC., Individually and on Behalf of all Others Similarly Situated,

## DEFENDANTS
MATSON NAVIGATION COMPANY, INC., ALEXANDER & BALDWIN, INC., HORIZON LINES, INC., and HORIZON LINES, LLC

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Daniel C. Girard, and Alex C. Turan
Girard Gibbs LLP,
601 California Street, Suite 1400, San Francisco, CA 94108
(415) 981-4800

Attorneys (If Known)

C 08 3597

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt. Reporting | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | or Defendant) | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | ☐ 871 IRS—Third Party | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | 26 USC 7609 | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. Sections 15 and 26
Brief description of cause:
Conspiracy to fix prices in violation of the Sherman Act

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)
☐ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE
July 28, 2008

SIGNATURE OF ATTORNEY OF RECORD

Daniel C. Girard (State Bar No. 114826)
Alex C. Turan (State Bar No. 227273)
**GIRARD GIBBS LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

Attorneys for Plaintiff TJ Gomes Trucking Co., Inc.

FILED

09 JUL 28  PM 12: 15

RICHARD W. WIEKING
U.S. DISTRICT COURT

**JL**

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**CV 08 3597**

TJ GOMES TRUCKING CO., INC., on behalf
of itself and all others similarly situated,

              Plaintiff,

              v.

MATSON NAVIGATION COMPANY, INC.;
ALEXANDER & BALDWIN, INC.; HORIZON
LINES, INC.; HORIZON LINES, LLC; and
DOES 1 TO 10,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.

**CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

1         Plaintiff TJ Gomes Trucking Co., Inc. ("Plaintiff"), through its undersigned counsel, alleges as

2 follows:

3 <center>**INTRODUCTION**</center>

4         1.      Plaintiff brings this action on its own behalf and on behalf of all those persons and entities

5 who purchased domestic ocean shipping services between the continental United States (the "Mainland")

6 and the State of Hawaii ("Hawaii") directly from one of the Defendants between at least July 2004 to the

7 present (the "Class Period).

8         2.      Defendants are domestic ocean shipping carriers that transport cargo between the

9 Mainland and non-contiguous states, as well as to U.S. territories and possessions. Defendants' routes

10 include service between the Mainland's West Coast and Hawaii. Plaintiff alleges that during the Class

11 Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize the price of

12 ocean shipping services between the Mainland and Hawaii.

13         3.      As a result of Defendants' unlawful conduct, Plaintiff and the members of the Class paid

14 artificially inflated prices for ocean shipping services to and from Hawaii. Such prices exceeded the

15 amount that would have been paid if the prices had been determined by a competitive market absent

16 Defendants' conspiracy.

17 <center>**JURISDICTION AND VENUE**</center>

18         4.      This action is brought pursuant to §§ 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26)

19 to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for

20 the injuries sustained by Plaintiff and members of the Class by reason of the violations, as alleged below,

21 of § 1 of the Sherman Act, 15 U.S.C. §1. This action is also brought to secure injunctive relief against

22 Defendants to prevent them from further violating the § 1 of the Sherman Act.

23         5.      Jurisdiction in this Court derives from 28 U.S.C. §§1331 and 1337 and §§4 and 16 of the

24 Clayton Act (15 U.S.C. §§ 15(a) and 26).

25         6.      Venue is proper here because, during the Class Period, one or more of the Defendants

26 resided, transacted business in this district, were found, or had agents in this district. Also, a substantial

27 portion of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected

28

<center>– 2 –</center>

1    interstate trade and commerce described below has been carried out in this district.

2                                              **PARTIES**

3        7.      Plaintiff TJ Gomes Trucking Co., Inc. is a Hawaii corporation with its principal place of

4    business in Wailuku, Hawaii.  During the Class Period, Plaintiff purchased domestic ocean shipping

5    services between the Mainland and Hawaii directly from one or more of the Defendants.  The prices that

6    Plaintiff paid to one or more Defendants or the co-conspirators were higher than they would have been in

7    the absence of the conspiracy described below, and as a result of the alleged conspiracy, Plaintiff was

8    injured by reason of the antitrust violations alleged here.

9        8.      Defendant Matson Navigation Company, Inc. ("Matson") is a Hawaii corporation with its

10   principal place of business in Oakland, California.  Matson is a wholly-owned subsidiary of Defendant

11   Alexander & Baldwin, Inc.  Matson is the principal carrier of domestic ocean cargo between the

12   Mainland and Hawaii.  Matson sold domestic ocean shipping services directly to Plaintiff and other

13   customers in the United States and its territories and possessions during the Class Period.

14       9.      Defendant Alexander & Baldwin, Inc. ("A&B") is a Hawaii corporation with it principal

15   place of business in Honolulu, Hawaii.  A&B is a multi-industry corporation whose ocean transportation

16   operations are conducted by Matson, its wholly-owned subsidiary.  By and through Matson, A&B sold

17   noncontiguous domestic ocean shipping services directly to Plaintiff and to other customers in the United

18   States and its territories and possessions during the Class Period.

19       10.     Defendant Horizon Lines, Inc. ("Horizon") is a Delaware corporation with its principal

20   place of business in Charlotte, North Carolina.  Through its operating subsidiary, Horizon Lines LLC,

21   Horizon sold domestic ocean shipping services directly to Plaintiff and to other customers in the United

22   States and its territories and possessions during the Class Period.

23       11.     Defendant Horizon Lines, LLC ("Horizon LLC") is a Delaware corporation with its

24   principal place of business in Charlotte, North Carolina.  Horizon LLC is a wholly-owned operating

25   subsidiary of Defendant Horizon.  Horizon LLC, after Matson, is the second largest carrier of domestic

26   ocean cargo between the Pacific coast of the Mainland and Hawaii.  Horizon LLC sold domestic ocean

27   shipping services to customers in the United States and its territories and possessions during the Class

28

                                                  - 3 -

1   Period.

2   ## AGENTS AND CO-CONSPIRATORS

3   12.   Whenever in this Complaint references are made to any act, deed or transaction of any

4   corporation, including Defendants, the allegation means that the corporation engaged in the act, deed or

5   transaction by or through its officers, directors, agents, employees or representatives while they were

6   actively engaged in the management, direction, control or transaction of the corporation's business or

7   affairs.

8   13.   Various other persons, firms and corporations, not named as Defendants in this Complaint,

9   have participated as co-conspirators with Defendants in the violations alleged here and performed acts in

10   furtherance of the conspiracy.  Throughout this Complaint, Matson, A&B, Horizon, Horizon LLC and

11   their co-conspirators are collectively referred to as "Defendants."

12   ## TRADE AND COMMERCE

13   14.   During the Class Period, Defendants sold substantial quantities of domestic ocean

14   shipping services in a continuous and uninterrupted flow of interstate and international commerce to

15   customers throughout the United States.

16   15.   Defendants' business activities that are the subject of this action were within the flow of,

17   and substantially affected, interstate and foreign trade and commerce.

18   ## FACTUAL ALLEGATIONS

19   ### Domestic Ocean Shipping Market

20   16.   Ocean shipping is a highly effective method of moving large quantities of goods and

21   materials.  The major commodities shipped using ocean shipping include crude petroleum, refined

22   petroleum products, chemicals, manufactured goods, farm products, and coal.

23   17.   Charges for ocean shipping are based on container size.  Containers range from 20 to 53

24   feet long and 8 to 9.5 feet high.  Charges are also made by revenue ton, that is the greater of the cubic

25   measure or weight of a shipment as packed for shipping and charges such as base ocean freight, terminal

26   handling charge, fuel surcharge, warfage Hawaii, warfage West Coast, neighbor island arbitrary, drayage,

27   intermodal rail, and demurrage.  In 2002, domestic ocean trades amounted to 196 million metric tons.

28

-4-

1    18.    Because of its location, Hawaii depends almost entirely on ocean shipping to import its
2    essential commodities like food, clothing, fuel, building materials, and automobiles, as well as to export
3    its local products like pineapple, sugar, molasses, and livestock to and from neighbor islands, the
4    Mainland, and various foreign countries. By one estimate, 98.6 percent of Hawaii's imports arrive by
5    ocean shipping. In 2003, over 5 million metric tons of cargo was shipped in non-contiguous domestic
6    trade with Hawaii.

7    19.    The current estimated annual container revenue for domestic ocean shipping to Hawaii is
8    at least $1.5 billion. This estimate is based on: i) approximately 6 sailings per week from the Mainland's
9    West Coast for 52 weeks per year; ii) an average of 1,000 containers on each sailing (for both Horizon
10   and Matson combined); iii) multiplied by an average revenue per container of approximately $5,000.

11   20.    In January 2008, the *Pacific Business News* reported that the cost of shipping goods to
12   Hawaii rose by as much as 40 percent since 2005. This was in part a result of Defendants' conspiracy
13   alleged here.

14                          **Inferential Evidence of Cartel Activity**

15   21.    The Hawaiian ocean shipping industry has several characteristics that facilitate a
16   conspiracy, including market concentration, ease of information sharing, homogeneity of products, and
17   significant barriers to entry.

18   22.    The Hawaiian ocean shipping market is a duopoly that is conducive to collusion. Matson
19   and Horizon control 100 percent of the containerized market and 96 percent of the total market for
20   Hawaiian ocean shipping, with the remaining 4 percent of cargo being carried by small specialized barge
21   and auto carrier lines.

22   23.    Each Defendant is a member of the Maritime Cabotage Task Force ("MCTF"). The
23   MCTF was founded on September 27, 1995 to protect the U.S. maritime cabotage laws. Both Matson
24   and Horizon are represented on the MCTF's Board of Directors. Philip Grill of Matson, and Chuck
25   Raymond and Robert Zuckerman of Horizon LLC are Board Members. These trade association meetings
26   provided the means and opportunity to initiate, monitor, foster, and/or advance the conspiracy alleged
27   here.

28

- 5 -

24.    Additionally, each Defendant has ready access to industry data that facilitates effectuation and monitoring of the conspiracy. For instance, PIERS, which stands for Port Import Export Reporting Service, collects and distributes, for a fee, data for the maritime industry. This data includes container size and quantity, cargo quantity, unit of measure, cargo weight, and cargo volume. This type of information within the industry allowed Defendants to monitor their conspiracy and verify that it is working.

25.    The shipping industry has been protected by almost all countries in the world because of the industry's importance to national security and defense, as well as international trade. Since the 1800s, ship owners participated in liner conferences to coordinate service, exchange market information, and agree on rates. In the international ocean shipping industry, the liner conferences, that have many cartel-like characteristics, have been exempt from the antitrust laws.

26.    Unlike international ocean shipping, the exchange of market information, agreements on prices, agreements on capacity allocation decisions, and the use of each other's capacity to sell to one's own shippers, are prohibited for carriers operating domestic ocean routes.

27.    Domestic ocean shipping takes place between the Mainland, Alaska, Puerto Rico, Hawaii, and other U.S. Pacific Islands. Under the Jones Act, 48 U.S.C. 100 *et seq.*, foreign competition is restricted on these domestic shipping routes allowing Matson and Horizon to dominate the ocean shipping market between the Mainland and Hawaii. Matson controls approximately 65% of that market and Horizon controls approximately 35%.

28.    There are substantial barriers to entry into the domestic ocean shipping industry that affect U.S. competition including, the high costs of purchasing and maintaining an ocean transport fleet and equipment, limits on the availability of compliance ships, constraints on port space, and entrenched market positions of the existing shipping companies.

29.    The Jones Act acts as another barrier to entry because it requires that all vessels transporting cargo between converted U.S. ports must, subject to limited exceptions, be built in the U.S., registered under the U.S. flag, manned predominantly by U.S. crews and owned and operated by U.S. organized companies that are controlled and 75% owned by U.S. citizens. Such vessels are generally

- 6 -

1    required to be maintained at higher standards the foreign flagged vessels.

2        30.    Horizon stated on page 3 of its 2007 Annual Report that "[g]iven the limited number of

3    existing Jones Act qualified vessels, the high capital investment and long delivery lead times associated

4    with building a new containership in the U.S., substantial investment required in infrastructure and the

5    need to develop a broad base of customer relationships, the markets in which we operate have been less

6    vulnerable to overcapacity and volatility than international shipping services."

7        31.    In addition, competition from air and surface transportation is necessarily limited due to

8    lack of availability, large enough and affordable air cargo space, and the trans-ocean shipping that must

9    occur.

10       32.    Despite the existence of a regulatory scheme over domestic ocean shipping routes, the

11   imposition of certain unreasonable fuel and other surcharges and rate increases as well as price fixing,

12   collusion, allocation of customers, capacity restrictions, and other anti-competitive conduct is not exempt

13   under the regulatory scheme. Accordingly, such actions remain illegal under the Sherman Act.

14                                    **The Jones Act**

15       33.    The Jones Act is a protectionist statute that prohibits any goods "transported by water, or

16   by land and water ... between points in the United States ... either directly or via a foreign port" from

17   being shipped unless the vessel "is wholly owned by citizens of the United States for purposes of

18   engaging in the coastwide trade" and has been issued a "certificate of documentation" or is exempt from

19   documentation. 46 U.S.C. § 55102.

20       34.    The purpose of the Jones Act is to protect American shipping companies. It grants an

21   exclusive privilege to certain U.S. made, U.S. manned, U.S. flagged, and U.S. Coast Guard approved

22   vessels to engage in ocean shipping of merchandise or goods to or from U.S. territories, possessions, or

23   non-contiguous States. These laws are restrictive, prohibiting all other vessels, such as foreign-flagged,

24   foreign-built, foreign-crewed, or even foreign-refurbished vessels, from engaging in this trade.

25       35.    The Jones Act's restriction on the carriage of domestic cargoes to U.S. made, U.S.

26   flagged, U.S. crewed, and U.S. owned ships control, combined with the relatively small size of these

27   trade routes, resulted in an essentially duopolistic Hawaiian ocean shipping market.

28

                                         - 7 -

1    36.    The Jones Act, however, provides no immunity to Defendants for their collusion, market

2    sharing, and/or price fixing, and the conspiracy alleged here is illegal under the Sherman Act.

3                                    **Defendants' Antitrust Violations**

4    37.    A major feature to Defendants' conspiracy has been sharing capacity on each other's

5    ships. Defendants' capacity sharing agreement allows each carrier to transport cargo on its competitor's

6    ships at preferential rates. Without this collusion and capacity sharing arrangement, Defendants would

7    have had to add additional vessels to their routes to carry their customer's cargo. That would result in

8    more capacity, more frequent service, and lower prices. The capacity sharing arrangement was the

9    functional equivalent to two duopolists acting like a monopoly. A study published by the U.S.

10   Department of Transportation's Maritime Administration in May 2006 explicitly equated excess capacity

11   with competition by stating that " … competitive downward pressure on freight rates may result from

12   overcapacity."

13   38.    During August 2001, Horizon (then CSX Lines) began shipping on Matson's midweek

14   sailing from Los Angeles, eventually withdrawing its own bi-weekly service. Horizon advertises this

15   midweek sailing as its "mid-week express." Less regularly, Matson also ships containers on Horizon's

16   sailings when Matson's own sailings are full.

17   39.    Competitors offering domestic ocean shipping services largely compete based on price.

18   Such services are, therefore, highly fungible between ocean carriers that do not generally have to worry

19   about substitute methods of transportation as competition due to the limited capacity and high costs of

20   shipping large, bulky goods by air and the lack of road or rail routes when shipping over the Pacific and

21   Atlantic oceans.

22   40.    Price fixing and market allocation become easier to attain in a highly concentrated,

23   fungible market, like in this case, in which adequate substitutes for a service do not exist.

24   41.    The structure of these domestic ocean shipping trade routes makes secret price-fixing

25   feasible. The market is highly concentrated with few sellers, and is controlled by the Defendants.

26   Demand is inelastic. There are barriers to entry in the form of expensive machinery and economies of

27   scale. There is a high ratio of fixed variable costs.

28

                                              - 8 -

1    42.    Another feature of Defendants' conspiracy has been parallel, identical, and near

2  simultaneous imposition of fuel surcharges. Fuel surcharges are a separate component of the cost to ship

3  cargo that is supposed to assist the carrier to recover fuel costs. Matson and Horizon justify their fuel

4  surcharges by claiming that the surcharges are necessary to offset the increases on fuel costs. In a truly

5  competitive market, the imposition of a fuel surcharge by a carrier that exceeds the actual cost of fuel

6  consumed should create competition from others. The more fuel efficient operator should find ways to

7  capture cargo from the less fuel efficient operator, and pricing would be one of those ways. Here,

8  however, Defendants chose not to compete based on price, and a plausible explanation for that lack of

9  competition in this duopoly is that Defendants were conspiring. Horizon acknowledged the lack of

10  competition in a February 1, 2008 press release that states: "we were able to generate net income and

11  earnings per share" based in part on "a stable rate environment in all three of our offshore markets."

12    43.    Matson and Horizon have raised prices and their surcharges in lockstep and in the same

13  amounts during the Class Period. They both introduced fuel surcharges for the first time in October 1999

14  at the rate of 1.75 percent of revenue. Since then, each liner adjusted its fuel surcharges 27 times. Each

15  adjustment occurred within days of the other's adjustment and was for the same amount. The following

16  chart illustrates this lockstep behavior. The numbers in the middle and right columns represent the

17  percentage of revenue of the fuel surcharges that Matson and Horizon charged.

18

19

| Effective Month and Year | Matson | Horizon |
|---|---|---|
| October 1999 | 1.75 | 1.75 |
| February 2000 | 2.25 | 2.25 |
| April 2000 | 3.25 | 3.25 |
| October 2000 | 4.25 | 4.25 |
| November 2001 | 3.25 | 3.25 |
| May 2002 | 4.75 | 4.75 |
| October 2002 | 6.0 | 6.0 |
| March 2003 | 7.5 | 7.5 |

28

- 9 -

| | | |
|---|---|---|
| May 2003 | 8.0 | 8.0 |
| June 2004 | 8.8 | 8.8 |
| October 2004 | 9.2 | 9.2 |
| April 2005 | 10.5 | 10.5 |
| July 2005 | 11.5 | 11.5 |
| October 2005 | 13.0 | 13.0 |
| January 2006 | 15.0 | 15.0 |
| April 2006 | 18.5 | 18.5 |
| June 2006 | 21.25 | 21.25 |
| October 2006 | 19.75 | 19.75 |
| November 2006 | 18.75 | 18.75 |
| January 2007 | 17.5 | 17.5 |
| March 2007 | 19.5 | 19.5 |
| May 2007 | 20.75 | 20.75 |
| May 2007 | 22.5 | 22.5 |
| August 2007 | 24.0 | 24.0 |
| December 2007 | 29.0 | 29.0 |
| February 2008 | 31.5 | 31.5 |
| April 2008 | 33.75 | 33.75 |

44.    Although Defendants claimed that these fuel surcharges were necessary to recoup increased costs, the surcharges did not reflect actual fuel cost increases. Fuel costs among ocean liners vary significantly due to a number of unique factors, such as differences in vessels and fuel efficiency, different routes, the use of hedging, and individual fuel conservation efforts. It is highly unlikely, if not impossible, that Matson and Horizon incurred identical fuel expense increases. Additionally, the revenue generated by the fuel surcharges depended on the underlying revenues generated per container and container utilization, both of which vary between the two carriers. Thus, it is highly unlikely that the fuel surcharges raised enough additional revenue to cover the increased costs that each carrier experienced.

1   45.   In addition to the lockstep fuel surcharge increases, Matson and Horizon acted in lockstep

2   on other matters as well.  In the spring of 2006, Matson announced that it would make surcharge changes

3   whenever it deemed necessary, rather than on a quarterly basis as had been its prior practice.  Shortly

4   after that announcement, Horizon changed its longstanding policy and announced it would adjust fuel

5   surcharges "in a more timely manner."

6   46.   Defendants' lockstep pattern was broken for the first time in recent months.  On May 9,

7   2008, Horizon announced that it would raise its fuel surcharge from 33.75 percent to 35.25 percent,

8   effective June 8.  On May 19, 2008, Matson announced that it would maintain its fuel surcharge at the

9   existing 33.75 percent level.  Two days later, on May 21, 2008, Horizon announced it would *not*

10   implement the previously announced increase and would instead keep the fuel surcharge at the existing

11   rate.  This break in the over 8 year pattern is significant because it occurred after the DOJ announced an

12   investigation into the "domestic ocean carriage" industry.

13   ### Government Investigation

14   47.   On or about April 17, 2008, the U.S. Department of Justice ("DOJ") announced an

15   investigation into possible anti-competitive practices in the domestic ocean freight shipping industry.

16   48.   Matson (through A&B) and Horizon, simultaneously disclosed that they were being

17   investigated.  Horizon's headquarters in Charlotte, North Carolina, was raided by federal agents armed

18   with search warrants.  On April 18, 2008, A&B disclosed that documents related to Matson were being

19   subpoenaed by the DOJ.  A&B and Horizon were the only containership operators between Hawaii and

20   the Mainland that were known to have been subpoenaed by the DOJ.

21   49.   Matson does not ship between the Mainland and Puerto Rico.  Horizon ships between the

22   Mainland and Puerto Rico and Hawaii.  The companies' press releases disclosed that pricing practices are

23   being investigated and that these practices are, therefore, focused on the Hawaii and Puerto Rico

24   domestic ocean shipping routes.

25   50.   Defendants hid their conspiracy behind the publicly-known fact of increasing oil and fuel

26   prices.  They took advantage of their increasing fuel costs by acting together to implement a scheme that

27   generated incrementally increased profit even as their costs increased.  Defendants intentionally used the

28

- 11 -

1   increase in fuel prices, which was well known to the public including Plaintiff and the Class, as a

2   subterfuge to artificially fix their fuel surcharges.

3       51.     Despite the increasing cost of operations, including cost of fuel, Matson's ocean

4   transportation division's operating profit skyrocketed from $93.2 million in 2003 to $126.5 million in

5   2007, a nearly 36% increase in only four (4) years.

6       52.     Beginning in 1999, the exact dates being unknown to Plaintiff, Defendants engaged in a

7   continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain

8   and/or stabilize prices of noncontiguous domestic ocean shipping and/or engaged in market allocation for

9   those services in the United States, its territories and possessions in violation of §1 of the Sherman Act

10  (15 U.S.C. §1).

11      53.     In formulating and effectuating the aforesaid contract, combination or conspiracy,

12  Defendants unlawfully combined and conspired, among other things, to allocate markets and/or

13  customers, to raise, fix, stabilize or maintain prices for noncontiguous domestic ocean shipping; to

14  exchange information on customers and capacity; and to monitor and implement the arrangements of the

15  cartel. Plaintiffs and the Class members were damaged in that they paid higher prices to purchase ocean

16  shipping to Hawaii than they would have paid absent Defendants' illegal conduct.

17  **CLASS ACTION ALLEGATIONS**

18      54.     Plaintiff brings this action on behalf of itself and as a class action pursuant to Federal

19  Rules of Civil Procedure 23(a) and (b)(3) on behalf of the following Class:

20  **All persons or entities in the United States and its territories and possessions, who purchased containerized domestic ocean shipping**
21  **services for service between the continental United States and Hawaii ("Hawaii Ocean Shipping") directly from a defendant, their**
22  **subsidiaries, agents and/or affiliates, or any co-conspirator, from the earliest date allowable by law through the present (the "Class Period").**

23  **Specifically excluded from this Class are the defendants; the officers, directors or employees of any defendant; any entity in which any**
24  **defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded are any**
25  **federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family**
26  **and judicial staff, and any juror assigned to this action.**

27

28

1   55.   This action has been brought and may properly be maintained on behalf of the Class

2   proposed above under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

3   56.   **Numerosity.** Members of the Class are so numerous that their individual joinder is

4   impracticable. It is estimated that the Class consists of thousands of members.

5   57.   **Existence and predominance of common questions.** Common questions of law and

6   fact exist as to all members of the Class and predominate over questions affecting only individual Class

7   members. These common questions include:

8           a.   Whether defendants engaged in a contract, combination or conspiracy among

9                themselves and/or their co-conspirators to raise, fix, and maintain the prices of

10               Hawaiian Ocean Shipping and/or engaged in market allocation for those services

11               sold in the United States and its territories and possessions;

12          b.   The identities of the co-conspirators;

13          c.   The duration of the conspiracy and nature and character of the acts done in

14               furtherance of the conspiracy;

15          d.   Whether the conspiracy violated Section 1 of the Sherman Act;

16          e.   Whether defendants actively concealed the contract, combination or conspiracy

17               from Plaintiff and other Class members;

18          f.   The effect of Defendants' conspiracy on the prices of Hawaiian Ocean Shipping

19               sold in the United States and its territories and possessions; and

20          g.   Whether Plaintiff and the members of the Class were injured by the conduct of

21               Defendants and their co-conspirators and, if so, the appropriate class-wide

22               measure of damages and appropriate injunctive relief.

23  58.   **Typicality.** Plaintiff's claims are typical of the claims of the Class in that Plaintiff

24  bought ocean shipping services from one of the Defendants and, like all Class members, was damaged

25  by the wrongful conduct of Defendants and their co-conspirators, and seek relief common to the Class.

26  59.   **Adequacy.** Plaintiff is an adequate representative of the Class because its interests do

27  not conflict with the interests of the members of the Class it seeks to represent. Plaintiff has retained

28

- 13 -

counsel competent and experienced in complex class action litigation, and intends to prosecute this action vigorously. The interests of the members of the Class will be fairly and adequately protected by Plaintiff and its counsel.

60. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this case as a class action.

61. In the alternative, the Class may be certified because:

    a. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members and would establish incompatible standards of conduct for Defendants;

    b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede the ability of other Class members to protect their interests; and

    c. Defendants acted or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief with respect to the members of the Class as a whole an appropriate form of relief.

62. Plaintiff reserves the right to expand, modify, or alter the class definition in response to information learned during discovery.

## FRAUDULENT CONCEALMENT

63. Plaintiff had no knowledge of Defendants' unlawful self-concealing conspiracy alleged here, or of any facts that might have led to the discovery of the conspiracy in the exercise of reasonable

1   diligence, until April 17, 2008, when the DOJ revealed its investigation of the domestic ocean shipping

2   industry.

3       64.    Because the conspiracy was kept secret by Defendants, Plaintiff was unaware of the

4   anticompetitive conduct concerning Hawaii shipping services until April 17, 2008. Plaintiff could not

5   have been aware of the conspiracy at an earlier date by the exercise of reasonable diligence because of

6   the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to

7   avoid detection and affirmatively conceal the violations.

8       65.    As a result of the fraudulent concealment of the conspiracy, Plaintiff asserts the tolling of

9   the applicable statute of limitations affecting the right of action by Plaintiff.

## CAUSE OF ACTION
### (Violation of the Sherman Act §1, 15 U.S.C. §1)

12      66.    Plaintiff hereby incorporates by reference the allegations contained in the preceding

13   paragraphs of this Complaint as if fully set forth here.

14      67.    Defendants colluded and agreed in unlawful restraint of trade to fix prices and surcharges

15   and allocated the Hawaii Ocean Shipping market.

16      68.    Defendants' unlawful conduct resulted in artificially high, supra-competitive

17   prices charged by Defendants and their co-conspirators to Plaintiff and the members of the Class for

18   domestic ocean shipping.

19      69.    Plaintiff and members of the Class had to pay more for these ocean shipping services than

20   they would have paid in a competitive marketplace, unfettered by Defendants' collusive and unlawful

21   price-fixing.

22      70.    Plaintiff seeks to recover for these overcharges.

23      71.    As a direct and proximate result of Defendants' scheme, Plaintiff and the members of the

24   Class have been injured and financially damaged in their respective businesses and property, in amounts

25   that are presently undetermined. Plaintiff's injuries consist of paying higher prices to purchase domestic

26   Hawaiian Ocean Shipping than it would have paid absent Defendants' conduct. Plaintiff's injuries are of

27   the type that antitrust laws were designed to prevent and flow from that which makes Defendants'

28

- 15 -

1  conduct unlawful.

2  **PRAYER FOR RELIEF**

3  WHEREFORE, Plaintiff and the members of the Class pray for relief as follows:

4  A.    That this action be certified and maintained as a class action under Rule 23(a) and (b)(3)

5  of the Federal Rules of Civil Procedure;

6  B.    That the unlawful conduct, contract, combination or conspiracy alleged here be adjudged

7  to be an unreasonable restraint of trade or commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1;

8  C.    That Plaintiff and members of the Class recover damages, including treble damages, as

9  allowed by law, together with the costs of this action, including reasonable attorney' fees;

10  D.    That Defendants, their affiliates, successors, transferees, assignees, and the officers,

11  directors, partners, agents and employees, and all other persons acting or claims to act on their behalf, be

12  permanently enjoined and restrained from continuing to engage in the anticompetitive conduct described

13  here;

14  E.    That Plaintiff and members of the Class have such other, further and different relief as the

15  case may require and the Court may deem just and proper under the circumstances.

16  **JURY DEMAND**

17  Plaintiff demands a trial by jury on all triable claims.

18  DATED: July 28, 2008                    Respectfully submitted,

19                                          **GIRARD GIBBS LLP**

20  By: _____

21                                          Daniel C. Girard
                                            dcg@girardgibbs.com
22                                          Alex C. Turan
                                            act@girardgibbs.com
23                                          601 California Street, 14th Floor
                                            San Francisco, California  94108
24                                          Telephone: (415) 981-4800
25                                          Facsimile: (415) 981-4846

26                                          *Attorneys for Plaintiff TJ Gomes Trucking Co.,*
                                            *Inc.*
27

28

- 16 -